IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 98-10989
Summary Calendar
_____

CARLA WEIDINGER,

Plaintiff-Appellant,

v.

FLOORING SERVICES INC; HARRY CROSBY, Individually for State
Law Claims,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Texas
(3:97-CV-782-R)

_____

April 2, 1999

Before KING, Chief Judge, EMILIO M. GARZA and DeMOSS, Circuit
Judges.

PER CURIAM:[*]

Plaintiff-appellant Carla Weidinger appeals the district

court's grant of summary judgment in favor of defendants-

appellees Flooring Services, Inc. and Harry Crosby on her Title

VII retaliation and constructive discharge claims.  We affirm.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

In 1992, plaintiff-appellant Carla Weidinger was hired by

---

[*]Pursuant to 5TH CIR. R. 47.5, the court has determined that
this opinion should not be published and is not precedent except
under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

defendant-appellee Flooring Services, Inc. (Flooring), a floor covering company, as a secretary/receptionist.  Her job duties included answering the telephones and performing word processing for Flooring's president and sole shareholder, defendant-appellee Harry Crosby, as well as vice-president Jack Easter, controller Hoshang Patel, and Flooring's salespeople.  In June 1994, Weidinger began working only Monday through Wednesday of each week.  At the time of the events giving rise to her lawsuit against Flooring and Crosby, she worked at a desk just outside Crosby's office and reported directly to him.

On March 14, 1995, Weidinger and a number of Flooring employees, including Crosby, met at a restaurant for after-work drinks.  Crosby gave Weidinger a ride home from the gathering.  During this trip, he rubbed her leg, held her hand, tried to kiss her, and told her that he loved her "as a woman."  Weidinger asked Crosby to take her home immediately, and he complied.  Upon arriving at her residence, Weidinger called Stephanie Robinson, Flooring's credit manager and one of its two sexual harassment officers, and related her experience with Crosby.  Weidinger made clear to Robinson that she did not wish to resign, but because Crosby had informed her that she could take the next day off and she was not scheduled to work on the next two days, Thursday and Friday, she did not return to Flooring until Monday, March 20, 1995.  At that time, she asserts, several Flooring employees avoided her, and Crosby and Easter rarely spoke to her or assigned her work.  Two days later, when Patel, Flooring's other

2

sexual harassment officer, returned from a trip abroad, he and Robinson met with Weidinger to discuss her complaint and the company's investigation; both asked Weidinger to contact them if she thought of anything that would make her more comfortable and to report any incidents of retaliation or harassment.

Over the next five weeks, Weidinger claims, she continued to receive very little work from Crosby and Easter, and, although she sometimes asked Patel for assignments, he gave her none. At the same time, Flooring advertised for a full-time administrative assistant; applicants were instructed to call Jan Sawtelle, another secretary, rather than Weidinger, whereas such advertisements had in the past read, "Call Jan or Carla." At one point, Weidinger says, she asked Sawtelle whether Sawtelle had noticed that Crosby and Easter were not giving her assignments. Sawtelle replied that she had and opined that Crosby and Easter were trying to make Weidinger "mad." In addition, on March 23, Weidinger noticed fresh scratch marks on her car, and both Robinson and Patel agreed that someone had deliberately damaged the car. Several colleagues also told Weidinger that other co-workers had accused her of "setting up" Crosby so that she could "get a piece of the company" and had expressed satisfaction when they thought she had quit after the March 14 incident.

On April 12, 1995, a demand letter from Weidinger's attorney, asking for $350,000.00 to compensate Weidinger and her husband for damages suffered as a result of the alleged harassment, was hand-delivered to Flooring. On April 19, 1995,

3

Robinson and Patel informed Weidinger that their investigation had revealed that Crosby had acted inappropriately and assured her that a written reprimand would be placed in his file. At the same time, they told Weidinger that she was being transferred from the secretarial desk outside Crosby's office to a new, enclosed office down the hall, that she would take over some of Sawtelle's duties while Sawtelle performed those assignments that required direct contact with Crosby, and that she would henceforth report to Patel rather than Crosby. When Weidinger protested, Robinson and Patel explained that the move was designed to "safeguard" both her and Crosby and that "the alleged harasser and the alleged victim require separation." Weidinger then requested and received a meeting with Crosby, whom she asked to allow her to retain her former desk and responsibilities. Crosby told Weidinger that the move was necessary to protect them both. That same day, two fellow Flooring employees asked Weidinger whether she had been "demoted to second banana" and whether "Harry [had gotten] tired of looking at [her]," and others asked why she was sitting at a new desk and whether her responsibilities had changed.

Weidinger filed suit in state court alleging retaliation and constructive discharge under Title VII and raising state law assault and intentional infliction of emotional distress claims. Flooring removed the action to the United States District Court for the Northern District of Texas and filed a motion for summary judgment. The magistrate judge recommended that the district

court grant summary judgment on Weidinger's federal claims and dismiss the state law claims without prejudice. With respect to the retaliation claim, the magistrate judge concluded (1) that Weidinger had failed to demonstrate that she suffered an adverse employment action and (2) that Flooring had offered a legitimate non-retaliatory reason for transferring Weidinger and changing her job duties, and Weidinger had failed to offer evidence that the true reason for her transfer was unlawful discrimination. As for the constructive discharge claim, the magistrate judge ruled that Weidinger failed to establish that working conditions were so intolerable that a reasonable employee would feel compelled to resign. The district court adopted the findings and conclusions of the magistrate judge. Weidinger appeals the grant of summary judgment on her retaliation and constructive discharge claims.[1]

## II. STANDARD OF REVIEW

We review a grant of summary judgment de novo, see Morris v. Covan World Wide Moving, Inc., 144 F.3d 377, 380 (5th Cir. 1998), applying the same standards as the district court, see Lodge Hall Music, Inc. v. Waco Wrangler Club, Inc., 831 F.2d 77, 79 (5th Cir. 1987). After consulting applicable law in order to ascertain the material factual issues, we consider the evidence bearing on those issues, viewing the facts and the inferences to be drawn therefrom in the light most favorable to the non-movant. See King v. Chide, 974 F.2d 653, 656 (5th Cir. 1992). Summary

---

[1] The dismissal of the state law claims is not at issue in this appeal.

5

judgment is properly granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986). The moving party bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact, see id. at 323, but the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial, see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). This requires the nonmoving party to do "more than simply show that there is some metaphysical doubt as to the material facts." Id. at 586. If the record taken as a whole could not lead a rational trier of fact to find for the nonmovant, there is no genuine issue for trial. See Szabo v. Errisson, 68 F.3d 940, 942 (5th Cir. 1995).

## III. DISCUSSION

### A. Retaliation

Title VII provides in relevant part that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [that employee] has . . . made a charge . . . under this subchapter." 42 U.S.C. § 2000e-3(a). A retaliation claim has three elements: (1) the employee engaged in activity protected by Title VII; (2) the

6

employer took adverse employment action against the employee; and (3) a causal connection exists between that protected activity and the adverse employment action.  See Mattern v. Eastman Kodak Co., 104 F.3d 702, 705 (5th Cir. 1997) (citing Shirley v. Chrysler First, Inc., 970 F.2d 39, 42 (5th Cir. 1992)).  The district court found that Weidinger failed to establish the second and third elements.

###    1.    Adverse Employment Action

We turn first to whether Weidinger suffered an "adverse employment action."  Our court has stated that "Title VII was designed to address ultimate employment decisions, not to address every decision made by employers that arguably might have some tangential effect upon those ultimate decisions."  Dollis v. Rubin, 77 F.3d 777, 781-82 (5th Cir. 1995).  Ultimate employment decisions include such acts as hiring, granting leave, discharging, promoting, and compensating.  See Mattern, 104 F.3d at 707 (citing Dollis, 77 F.3d at 781-82)).

Weidinger's claim that she suffered an adverse employment action rests on two assertions: (1) After she complained of sexual harassment, several co-workers ignored or gossiped about her and Crosby and Easter avoided speaking to her, and (2) she was assigned relatively little work after her complaint and ultimately was transferred to a different office and relieved of her duties as Crosby's personal secretary.  We address these allegations in turn.

Even viewed in the light most favorable to her, Weidinger's

7

colleagues' alleged conduct in being hostile to her, avoiding her, gossiping about her, and even damaging her car is not an adverse employment action.  "Hostility from fellow employees, having tools stolen, and resulting anxiety, without more, do not constitute ultimate employment decisions, and therefore are not the required adverse employment actions."  Mattern, 104 F.3d at 707 (citing Landgraf v. USI Film Prods., 968 F.2d 427, 431 (5th Cir. 1992), aff'd, 511 U.S. 244 (1994)); see DeAngelis v. El Paso Mun. Police Officers' Ass'n, 51 F.3d 591, 594-97 (5th Cir. 1995) (finding no retaliation where office newsletter ran articles routinely ridiculing the plaintiff based on her gender and her having filed a Title VII complaint); Hill v. Mississippi State Employment Serv., 918 F.2d 1233, 1241 (5th Cir. 1990) (finding no retaliation where co-workers stared at employee, followed her, delayed her disbursement checks, destroyed her identification card, deleted experience data from a reference form, and criticized her Title VII complaint).  Nor does the alleged reticence of Weidinger's superiors constitute an adverse employment action.  See Webb v. Cardiothoracic Surgery Assocs., 139 F.3d 532, 540 (5th Cir. 1998) (holding that a superior's rude and uncivil treatment of an employee is not an adverse employment action).  Indeed, the Supreme Court recently cautioned against the expansion of Title VII into a general civility code.  See Oncale v. Sundowner Offshore Servs., Inc., 118 S. Ct. 998, 1002-03 (1998).

Similarly, Weidinger's complaint that she was given little

8

work and eventually was transferred to a different office, relieved of her duties as Crosby's personal secretary while given certain new responsibilities, and required to report directly to Patel instead of to Crosby does not describe an adverse employment action. Of course, a demotion is an adverse employment action under Title VII, and a transfer can constitute a demotion. See Sharp v. City of Houston, 164 F.3d 923, 933 & n.21 (5th Cir. 1999). "To be equivalent to a demotion, a transfer need not result in a decrease in pay, title, or grade; it can be a demotion if the new position proves objectively worse--such as being less prestigious or less interesting or providing less room for advancement." Id. at 933. Thus, in Forsyth v. City of Dallas, 91 F.3d 769, 774 (5th Cir. 1996), we found that a police officer's transfer from the Intelligence Unit to uniformed night patrol was in fact a demotion because the evidence "revealed that the Intelligence Unit positions were more prestigious, had better working hours, and were more interesting than night patrol. Moreover, few officers voluntarily transferred from the Intelligence Unit to night patrol and other officers had been so transferred as punishment." But, we cautioned, "a plaintiff's subjective perception that a demotion has occurred is not enough." Id.[2]

_____

[2] We recognize that Sharp and Forsyth addressed claims of retaliation in violation of the plaintiffs' First Amendment rights under 42 U.S.C. § 1983. While the definition of "adverse employment action" may differ slightly under Title VII and § 1983, see Sharp, 164 F.3d at 933 n.21 (explaining that a reprimand is not an "adverse employment action" under Title VII but is under § 1983), a demotion is an "adverse employment

9

Weidinger has presented no more than her own belief that she was demoted. Weidinger did not suffer a change in job title, compensation, and benefits. The record shows that she suggested to Robinson and Patel that reporting to Patel, Flooring's third-in-command, was less prestigious than reporting directly to Crosby, but she presents no evidence to support this claim other than a statement in her affidavit that a fellow employee asked her after the transfer whether she had become "second banana." Moreover, Patel told her that she could continue to state on her resume that she was secretary to the president of Flooring. Nor does she raise a genuine issue of fact as to whether her job became less interesting after she complained. Her claim that Crosby and Easter immediately began withholding work from her is not supported by her own affidavit, in which she recounts significant job functions that she was assigned and completed each day.[3] Although Weidinger insists that after she formally moved down the hall, she lost eighty percent of her duties and was left with some nineteen idle hours each week, she does not support these allegations with any evidence, such as time sheets or lists of duties. On the contrary, the record shows that

_____

action" under both statutes, see id. In Sharp and Benningfield v. City of Houston, 157 F.3d 369, 377 (5th Cir. 1998), we found that a transfer can constitute a demotion under § 1983. We see no reason why this should not also be true under Title VII.

[3] Weidinger made phone calls, paged salespeople, and typed memoranda at Crosby's and Easter's request, worked late to finish a report, redid the holiday schedule, did salary draws, sorted Texas Rangers tickets, and filled in for the absent receptionist for several days.

Weidinger retained the vast majority of her previous responsibilities, relinquishing only the making of travel arrangements and tasks that required daily contact with Crosby. Furthermore, Flooring assigned her to take over Sawtelle's job of preparing weekly repairmen draws and to assist Patel on special projects. Although Weidinger complains that she was assigned the draws because "[n]obody liked doing that," she presents no evidence to this effect other than her own conclusory statement. Finally, she does not so much as allege that the new position provided less room for advancement. Thus, she presents no evidence that she suffered an adverse employment action. Because our conclusion that Weidinger failed to establish an adverse employment action is fatal to her Title VII retaliation claim, we need not decide whether the district court was correct in determining that she did not show that a causal connection exists between activity protected by Title VII and any adverse employment action.

## B. Constructive Discharge

Weidinger also claims that she was constructively discharged in violation of Title VII. See Miller v. Texas State Bd. of Barber Examiners, 615 F.2d 650, 652 (5th Cir. 1980) (recognizing "a Title VII cause of action for wrongful discharge when an employer deliberately creates a discriminatory environment which literally forces an employee to involuntarily resign"). In order to prove constructive discharge, a plaintiff must establish that her working conditions were so intolerable that a reasonable

employee in her position would feel compelled to resign.  See Webb, 139 F.3d at 539.  In our determination, we consider many factors relevant, including evidence of badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation.  See Faruki v. Parsons S.I.P., Inc., 123 F.3d 315, 319 (5th Cir. 1997) (citing Barrow v. New Orleans S.S. Ass'n, 10 F.3d 292, 297 (5th Cir. 1994)).

Weidinger's brief before this court insists that she meets this standard:

> Despite the prostestations of the District Court, any reasonable person would have felt compelled to resign after complaining of sexual harassment involving the president of the company, after which elapsed five weeks of interminable time standing still because [Crosby] refused to give [Weidinger] work, being transferred and demoted within a week of the receipt of Weidinger's attorney's demand letter of April 12, 1995, and ultimately learning that Crosby was to receive a written reprimand while she was stripped of her job and desk, punished out of concern for her interests.

Weidinger has adduced no summary judgment evidence to show that her working conditions were intolerable.  First, as we state above, her claim that Flooring ceased giving her work before her transfer is belied by her own affidavit.  In any case, as the district court correctly observed, Weidinger resigned from the post-transfer position, and it is therefore this job that we must examine in making our constructive discharge analysis.  See Landgraf, 968 F.2d at 430-31 (evaluating, for constructive discharge purposes, the tolerability of working conditions as they existed at the time of resignation, not at earlier times).  Weidinger has not shown how her post-transfer job was so intolerable that a reasonable employee in her position would feel

12

compelled to resign. After she was transferred, Weidinger retained her previous title, pay, benefits, and most of her job responsibilities. Although she contends that some of her new duties were unpopular and that some of her colleagues considered her new supervisor, Patel, a "hard ass," she provides no evidence that a reasonable employee would find the tasks intolerable and conceded that she had no objection to working with Patel. Apart from two tasteless but hardly intolerable comments from colleagues that she must have been "demoted to second banana" and that Crosby was "tired of looking at" her and a few questions from co-workers as to why she was in a new office, she suffered no badgering, harassment, or humiliation whatsoever. We see nothing in the summary judgment record that shows that Weidinger's post-complaint tenure at Flooring was so intolerable that a reasonable employee in her position would have felt compelled to resign. The district court therefore correctly granted summary judgment in favor of the defendants-appellees on her constructive discharge claim.

## IV. CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.

13